25-05607MB

## AFFIDAVIT

I, Joshua Spaulding, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1)      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic device and removable media listed in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2)      There is probable cause to believe that a search of the device described herein and in Attachment A will lead to evidence of violations of **21 USC 841 – Possession With Intent To Distribute - Fentanyl**, as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3)      The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation.  As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the device.

4)      I am a Special Agent (SA) employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed as a Special Agent since June 2023. I am assigned to the Assistant Special Agent in Charge (ASAC), Nogales, Arizona office. I have completed the Criminal Investigator Training Program (CITP) and HSI Special Agent Training (HSISAT) located at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. Additionally, prior to becoming a Special Agent, I was employed for twelve (12) years as

a Border Patrol Agent with the United States Border Patrol (USBP). Through my training and experience, I have received instruction and worked on investigations involving controlled substances and the smuggling of other contraband, operations of Drug Trafficking Organizations (DTOs), contraband concealment and transportation techniques, interdiction operations, surveillance techniques, report writing, confidential source management, and training regarding the interception of wire, oral, and electronic communications, among other areas. In 2007, I received a bachelor's degree in communication design from the State University of New York College at Buffalo.

5)     Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and structure of contraband smuggling organizations. My responsibilities include conducting investigations into DTOs and individuals who derive substantial income from the illicit movement and distribution of narcotics and/or firearms. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law to include the enforcement of various federal customs and immigration laws.

6)     Through training and experience I know:

   a)     That individuals involved in criminal activities such as drug trafficking are commonly in communication via cellular telephones with additional co-conspirators capable of providing resources in furtherance of criminal activity;

   b)     That contraband smugglers maintain books, records, receipts, notes, ledgers, personal computers, cellular phones, money orders and other papers relating to the movement and storage of narcotics;

   c)     That large-scale narcotics traffickers often utilize electronic equipment such as cellular telephones and/or and computers to generate, transfer, count, record, and/or store information;

d)      That narcotics smugglers commonly use cellular telephones to communicate with their associates and to facilitate movement and housing of narcotics. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the narcotics trafficking associates and/or activity, all of which can be used to identify and locate associates, to identify methods of operation of the traffickers, and to corroborate other evidence obtained during the course of the current investigation;

e)      That narcotics traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property, and their narcotics. That these smugglers usually maintain these photographs within their possession, in their residences, vehicles, businesses, cellular telephones, or other locations which they maintain dominion and control over.

7)      DTOs often utilize known couriers and maintain constant communication with their couriers/conspirators during the timeframe before crossing the POE, throughout their destination to Tucson/Phoenix, and ultimately upon being paid or completing the task requested.

8)      DTOs often use text messages to coordinate between the individuals participating in any given smuggling event.  The use of text is convenient because it is quiet, discreet, and can be read whenever it is opportune for whomever is receiving the message. Often times, directions are sent via text.  Other messaging programs that the DTOs exploit include WhatsApp, WHISPER, and Facebook Messenger.  They use these programs to solicit and recruit for drivers, scouts, heat vehicles, and lookouts to fill roles in the scheme. Often times, payment for these jobs are discussed on these platforms. The DTO uses these platforms because they are usually more difficult to track.

9)     Thorough examining of data stored on the devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of the locations and identities of persons with which the device communicated, and communications (photographic and electronic) between members of DTOs.

10)    The large, well-established DTOs along the southwest border routinely compartmentalize their illegal operations. These DTOs employ various sub organizations or "cells", which independently accomplish such tasks as: the receipt and transportation of illegal narcotics, in and through Mexico; the importation of the illegal contraband into the United States; the storage and concealment of the illegal contraband along the southwest border in the United States; and the transportation of the illegal contraband from the southwest border to destinations within the interior of the United States.

11)    This affidavit is based on information which is personally known by me or which I learned from other law enforcement agents. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

12)    The purpose of this warrant is to search one **(1) Black Cellphone, (Target Phone 1).** The property to be searched is documented on **DHS forms 6051S No. 2025260400016101**, as **Line Item 004**, **BLACK CELLPHONE**, belonging to the event **2025SA0004063**, as described in Attachment A.  Target Phone 1 was recovered from the vehicle **VALLEJO-Parra** was driving, among his other possessions.

13)    Target Phone 1 is currently in law enforcement custody and is being held at the HSI Nogales office; 41 Paseo De Yucatan, Rio Rico, AZ 85648.

14)    The applied-for warrant would authorize the forensic examination of Target Phone 1 for the purpose of identifying electronically stored data, as described in Attachment B.

**PROBABLE CAUSE**

15)    On December 21, 2024, at approximately 6:45 p.m., Salvador VALLEJO-Parra (a United States Citizen) attempted to enter the United States from Mexico via the vehicle lanes at the DeConcini Port of Entry (POE) in Nogales, AZ. VALLEJO was the driver, sole occupant and registrant of a white Nissan Armada bearing Nevada license plate PD6317. Customs and Border Protection Officer (CBPO) Jorge Rodriguez was working primary inspection and asked VALLEJO where he was coming from. VALLEJO responded that he was returning from the hospital and that he had some medical issues. CBPO Rodriguez noticed the Armada bore a law enforcement support specialty license plate and asked VAJJEJO about it. VALLEJO responded that he tried getting into the Nevada Police department but couldn't because he had a stomach flu. CBPO Rodriguez found VALLEJO's response odd and began inspecting the vehicle further.

16)    CBPO Rodriguez noticed a strong odor of fresh paint when he walked around the rear passenger door and then noticed the rear floor carpet was out of place. CBPO Rodriguez then lifted the carpet and observed fresh paint. CBPO Rodriguez asked VALLEJO if anyone else used the vehicle while VALLEJO was in Mexico and VALLEJO stated that no one else used the vehicle. CBPO Rodriguez took a negative binding declaration from VALLEJO and referred VALLEJO to secondary inspection.

17)    VALLEJO's vehicle was scanned by the Z-Portal X-ray and no anomalies were detected. A canine screen of the vehicle produced negative findings.

18)    CBPO Fernando Enriquez was assigned secondary inspection. CBPO Enriquez asked VALLEJO where he was going, and VALLEJO responded that he was going to Casa Grande. CBPO Enriquez asked VALLEJO if the vehicle and everything in it was his, and

VALLEJO responded that it was. CBPO noticed that VALLEJO was visibly shaking while he responded to questions. CBPO Enriquez questioned VALLEJO as to the purpose of his travel to Mexico. VALLEJO responded that he was at the doctor and had been hospitalized for a few days due to having a stomach bug.

19)     During a physical examination, CBPOs observed fresh paint, mud spray and cracks in the finish under the vehicle as well as fresh putty on the surface of the floor. After prying a crack in the finish under the Armada, a saran wrap package was visible. After accessing the compartment, 25 packages were removed. The packages were weighed on a calibrated scale and totaled 22.75 KG (50.15lbs). The packages were tested by CBPO Enriquez and yielded a positive result for the properties of hydrochloride fentanyl.

20)     VALLEJO was in possession of a cell phone when he was detained by CBPOs. The cell phone was placed in an evidence bag and left unsealed. The cell phone was logged as Line Item 0004 – BLACK CELLPHONE. I, SA Spaulding, arrived at the DeConcini POE and spoke with CBPOs regarding their involvement in the narcotics seizure. I then took possession of Target Phone 1. CBPO Enriquez and I escorted VALLEJO to the interview room.

21)     After reviewing his Miranda rights, VALLEJO agreed to participate in an interview. During that interview, VALLEJO explained that he had been in Casa Grande working a construction job that week from Tuesday until Friday. On Friday he felt ill and traveled to Mexico to seek treatment. VALLEJO said he crossed into Mexico at approximately 11:30 a.m. on Friday, checked into the Hotel Hacienda del Real, and immediately slept until 4 or 5 p.m. VALLEJO said at approximately 8 or 9 p.m., after numerous phone calls, he was able to get ahold of a doctor to come to the hotel and treat him. VALLEJO said he wanted to save the money it would cost going to the hospital. When questioned as to how a "house call" from a doctor would be less expensive that going to an urgent care clinic, VALLEJO said it was less money and that doctors don't work the same hours in Mexico. VALLEJO said the doctor gave him an IV which took until about 1 a.m.,

and some medicine (pepto-bismol). VALLEJO said he then slept until 12 p.m. on Saturday, and left the hotel to get into the line to cross back into the United States around 3 or 4 p.m. I showed VALLEJO Target Phone 1 and he confirmed that it belonged to him.

22)     Based on my training and experience, I know couriers will remain in contact with Drug Trafficking Organizations (DTOs) and utilize cell phone communications before, during, and after delivering the narcotics to their destination. VALLEJO was in possession of a cellular device during the seizure timeframe, he claimed the device belonged to him and he also admitted to recent use of the cell phone the day before he crossed into the United States.

**TECHNICAL TERMS**

23)     Based on my training and experience, I use the following technical terms to convey the following meanings:

a)     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b)      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

c)      Portable media player:  A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. Most cell phones currently manufactured contain portable media players as a standard feature.

d)      GPS:  A GPS navigation device uses the Global Positioning System (GPS) to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals

from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. Most cell phones currently manufactured contain GPS as a standard feature.

       e)      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

24)    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Phone 1 has capabilities that allow it to serve as a wireless telephone, receive and send email, instant messaging, a digital camera, and serve as a GPS navigation device.

25)    Although some of the records requested in this affidavit might be found in the form of user generated documents (such as electronic format documents and picture and movie files), an electronic communication device, such as the Target Phone 1, can contain other forms of electronic evidence that are not user generated.  In particular, electronic communication devices may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers, and other persons involved in the forensic examination of electronic communication devices, I know that:

a)      Virtual memory calling/paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

b)      Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords; Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions on which the peripheral electronic devices were accessed;

c)      Computer file systems can record information about the dates that files were created and the sequence in which they were created.  This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

d)      When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created, as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

e)      The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user.  All of these types of evidence may indicate ownership, knowledge, and intent to commit a given offense; and

f)      The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators.  Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how

electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence described in Attachment B hereto also falls within the scope of the warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26)     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

27)     Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Target Phone 1 was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on Target Phone 1:

    a)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b)     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c)     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28)    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Phone 1 consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of Target Phone 1 to human inspection in order to determine whether it is evidence described by the warrant.

29)    *Manner of execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30)    The Target Phone 1 has been properly stored by the United States Department of Homeland Security. Due to the nature of wireless telephones, data contained within will remain uncorrupted when being stored for an extended period.

## CONCLUSION

I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Target Phone 1 as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

JOSHUA J SPAULDING

Digitally signed by JOSHUA J SPAULDING
Date: 2025.01.22 09:43:26 -07'00'

Joshua Spaulding, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me telephonically on January 22, 2025.

Honorable Lynnette C. Kimmins
United States Magistrate Judge